## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## (AUSTIN DIVISION)

| | | |
|---|---|---|
| ERICA LAFFERTY, *et al.*, | § | |
| Plaintiffs (Judgment Creditors) | § | |
| | § | **Civil Action 1:24-cv-1198** |
| vs. | § | |
| | § | |
| ALEXANDER E. JONES, et al., | § | |

_____

## ALEX JONES'S ANSWER, AFFIRMATIVE
## DEFENSES SUBJECT THERETO, AND COUNTERCLAIMS

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

In response to Plaintiffs'[1] Application for Domestication of the Connecticut Judgment and for Post-Judgment Turnover and Appointment of Receiver as to Judgment Debtor Alexander E. Jones (the "Removed State Court Suit"), Alex Jones ("Jones") timely files this Answer, Affirmative Defenses, and Counterclaims, and in support thereof would show as follows:

### I.
### JONES' ANSWER

1.    Jones denies generally the multiple allegations and conclusions set out in ¶1 of the Removed State Court Suit including that Jones is now obligated to the Connecticut Plaintiffs on the non-final Connecticut Judgment.

2.    Jones denies that the Connecticut Judgment is enforceable against the discharge in bankruptcy of Jones, including because of the fact that the Connecticut Judgment was rendered by fiat of a state judge and not a "clear and convincing" jury finding.  Also, damages were awarded on a preponderance standard instead of a clear and convincing standard.

_____

[1]    Plaintiffs are David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, Williams Aldenberg, William Sherlach, Robert Parker, and Erica Ash (formerly Erica Lafferty) (collectively the "Connecticut Plaintiffs")

3.     Jones denies that the Connecticut Judgment is enforceable as it is against Texas public policy.

4.     Jones denies that the Connecticut Judgment has been properly domesticated and alleges that such purported domestication was concealed from Jones, was obtained without due process of law or in strict compliance with Texas Domestication Statutes, and accordingly is void.

5.     Jones denies that on October 19, 2023, the Bankruptcy Court entered a "final order" determining that $1,115,000,000 of the Connecticut Judgment was non-dischargeable in bankruptcy and, therefore, unaffected by the bankruptcy proceedings (the "Purported Non-Dischargeable Connecticut Judgment").  In fact, Jones sought an interlocutory appeal of this interlocutory partial summary judgment, findings and conclusions, but such interlocutory appeal was denied and accordingly, the summary judgment remains partial, interlocutory and subject to bankruptcy court reconsiderations, and such claim by the Connecticut Plaintiffs that the judgment is "final" is false.

6.     No final judgment on dischargeability of the Connecticut Judgment is final in Connecticut, and accordingly cannot have been domesticated in Texas and cannot support any claims of a right to execution on any purported assets of Jones or support the extraordinary remedy of a receiver on a non-final appealed judgment.

7.     Although Jones admits the allegations of ¶2 of the Removed State Court Suit that the United States Bankruptcy Court for the Southern District of Texas issued an Order vesting authority in the trustee appointed for Judgment Debtor Alex Jones' bankruptcy to take control of Judgment Debtor Free Speech Systems, LLC ("FSS") cash assets, including its bank accounts, and entered an order permitting the Trustee to dispose of those assets for the benefit of Alex Jones'

creditors,[2] Jones (and now Jones' Chapter 7 Trustee) owns 100% of the equity interests in FSS and 100% of the non-exempt assets of Jones, including this equity.

8.      Jones denies in ¶ 2:

     a.   that the bankruptcy court has determined the rights to any assets of FSS or Jones *viz-a-viz* creditors competing interests, nor has the bankruptcy court rendered any "final" "appealable" judgment or order allowing or disallowing either exemptions or determining dischargeability of the Connecticut Judgment. Accordingly, any action, no matter how intricately described by Plaintiffs, can access any property or personal and persona interest of Jones until the bankruptcy court enters such final orders.    No receiver could be appointed to take control of assets in the jurisdiction of the bankruptcy court; and

     b.   that the Connecticut Plaintiffs have any judgment, including the Connecticut Judgment, that is final, *non-appealable*, properly domesticated, and recognized as enforceable to support an execution, attachment or the drastic remedy of a receiver.

9.      Jones denies generally the allegations and conclusions of Plaintiffs in ¶3 of the Removed State Court case regarding liquidated or unliquidated claims against Jones.  Jones alleges that no such determination may be made until (i) all claims are reduced to a judgment that is final and appealable and non-stayed; (ii) all claims are found to be non-dischargeable by final order that is non-appealable; and (iii) all claims to exemptions of Jones have been determined by final order non-appealable or non-stayed.  Important to this denial is that neither the Connecticut Judgment or the Texas Judgment are final on appeal, and both are stayed pending appeal either by statute[3] or by agreement or alternatively, both judgments are subject to supersedeas rights of Jones, under

---

[2]      See Dkt. 956 (June 21, 2024), No. 22-60043 (Bankr. S.D. Tex.).

[3]      *See*, Connecticut Judgment is Stayed Until a Final Judgment.  The following is from the Connecticut Practice Book – Rules of Court:

Sec. 61-11. Stay of Execution in Noncriminal Cases (a) Automatic stay of execution Except where otherwise provided by statute or other law, proceedings to enforce or carry out the judgment or order shall be automatically stayed until the time to [take] file an appeal has expired. If an appeal is filed, such proceedings shall be stayed until the final determination of the cause. If the case goes to judgment on appeal, any stay thereafter shall be in accordance with Section 71-6 (motions for reconsideration), Section 84-3 (petitions for certification by the Connecticut supreme court), and Section 71-7 (petitions for certiorari by the United States supreme court).

both Connecticut law and Texas law.  [*See*, *also*, AMENDED Notice of Removal, Dkt. 7].

10.     Jones also denies the Connecticut Plaintiffs may change the law and statutes to allow proceeds available to satisfy a judgment to be applied is some manner agreed among judgment holders other than as specified by statute and law;  that is, Plaintiffs cannot, as suggested in ¶ 3, overcome the first claim by Texas Plaintiffs to priority over the funds, and at the same time compel payments to judgment creditors to be applied other than in strict compliance with Texas law.

11.     Jones denies that such agreed relief set out in ¶ 3 is allowable at law.  In this regard, Jones would show that the Texas Plaintiffs have already tried to execute on assets of FSS and such efforts were removed to the bankruptcy court where they remain subject to the determination of the bankruptcy court to entitlement of the pending sale and resulting proceeds, just as this removal should be handled, and such collection action has not been remanded by the bankruptcy court.

12.     As set out above, Jones denies that the Connecticut Plaintiffs have any judgment, including the Connecticut Judgment, that is final, non-appealable, domesticated, and recognized as enforceable to support an execution, attachment or the drastic remedy of a receiver.

13.      Jones denies the Plaintiffs' allegations and conclusions in ¶ 4 that:

    a. Connecticut Plaintiffs are not seeking relief that violates the automatic stay.  In fact, the Connecticut Plaintiffs have violated the automatic stay by setting the hearing on Turnover and Receivership without notice to the Bankruptcy Court and seeking lifting of the automatic stay; and

    b. that it is the Connecticut Plaintiffs that are permitted by law to determine whether or not "… any assets acquired by Judgment Debtor Alex Jones after his case was converted to a Chapter 7 on June 14, 2024, *(does) not constitute property of the Chapter 7 bankruptcy Estate* and are thus available to satisfy the Judgment." That determination is in the exclusive jurisdiction of the bankruptcy court, and includes assets paid by the Chapter 7 estate after that date to Jones for his continued maintenance and broadcast of "The Alex Jones Show" to facilitate the sale and income of FSS pending this sale which salary to Jone is, as an example, exempt

14.     As set out above, Jones denies that the Connecticut Plaintiffs have any judgment, including the Connecticut Judgment, that is final, non-appealable, domesticated, and recognized as enforceable to support an execution, attachment or the drastic remedy of a receiver.

15.     Jones denies the allegations and conclusions of the Connecticut Plaintiffs set out in ¶ 5 of the Removed State Court Suit that the Connecticut Plaintiffs are entitled to any of the relief listed in ¶ 5.  As set out above, Jones denies that the Connecticut Plaintiffs have any judgment, including the Connecticut Judgment, that is final, non-appealable, domesticated, and recognized as enforceable to support an execution, attachment or the drastic remedy of a receiver.

16.     Jones agrees with the judicial admission of the Connecticut Plaintiffs in ¶ 6 that the only rights of Plaintiffs "… to execute on the Judgment (shall be only) in accordance with any prospective developments in any bankruptcy proceeding pertaining to the Judgment Debtor (Jones)."  [*See*, ¶ 6, pg. 4, Removed State Court Suit].   Jones denies all other statements.  As set out above, Jones denies that the Connecticut Plaintiffs have any judgment, including the Connecticut Judgment, that is final, non-appealable, domesticated, and recognized as enforceable to support an execution, attachment or the drastic remedy of a receiver.

17.     Jones is not required to admit or deny the statements in ¶7.

18.     Jones denies the Plaintiffs' suggested and conclusion in ¶ 8 of the application of TEX. CIV. PRAC. & REM. CODE § 31.002(a) justifies or authorizes a receivership over Jones interests or rights in and to property in the custody of the bankruptcy court, or as a result of the improper and void attempt to domesticate the Connecticut Judgment.

19.     Jones denies the Plaintiffs' suggestion and conclusion in ¶ 9 that the application of TEX. CIV. PRAC. & REM. CODE § 31.002(b) justifies or authorizes a receivership over Jones

interests or rights in and to property in the custody of the bankruptcy court, or as a result of the improper and void attempt to domesticate the Connecticut Judgment.

20.     Jones denies the allegations and conclusions in ¶ 10 that there is non-exempt property disclosed in discovery responses of Jones Exhibit "1".  As suggested in the Declaration of Alinor C. Sterling, Jones denies that the Connecticut Plaintiffs have any judgment, including the Connecticut Judgment, that is final, non-appealable, domesticated, and recognized as enforceable to support an execution, attachment or the drastic remedy of a receiver.

21.     Jones denies the allegations and conclusions in ¶ 11 that the Receiver is entitled to "turn over all non-exempt, non-bankruptcy estate property*"* of Jones and alleges that the facts of jurisdiction and the Texas or federal statutes do not authorize such an order and Connecticut does not have a domesticated judgment to support such relief.   As set out above, Jones denies that the Connecticut Plaintiffs have any judgment, including the Connecticut Judgment, that is final, non-appealable, domesticated, and recognized as enforceable to support an execution, attachment or the drastic remedy of a receiver.

22.     Jones is not required to admit or deny the legal conclusions set out in ¶ 12 of the Motion.

23.     Jones is not required to admit or deny the legal conclusions set out in ¶ 13 of the Motion.

## II.
## JONES'S AFFIRMATIVE DEFENSES

24.     **Illegality** – the Domestication of the Judgment was obtained by Connecticut Plaintiffs' denial of Jones Constitutional and due process rights and is void.

25.     **Fraud** – the domestication of the Connecticut Judgment was obtained by misstatement of fact, misleading statements regarding "final" non-dischargeable orders, and false

certificates of service that purport to represent that the domestication statute had been timely and properly served.

26.     **Lack of Standing** – no final judgment entitled to enforcement.  The Connecticut Plaintiffs have no standing to seek either the Domestication of the Connecticut Judgment or the Turnover order or the Receivership.

27.     **Void Judgment** – the Domestication of the Connecticut Judgment was procured by the denial of due process notice to Jones and is void.

28.     **Violations of Jones's Constitutional Rights** – for the reasons set forth in the Counterclaim that follows (which is incorporated herein by reference), the Connecticut Judgment has been procured by numerous violations of Jones's rights guaranteed under the Constitution and is therefore void and/or unenforceable.

29.     **Unconstitutional and Unlawful Emotional Distress Damages** – the amounts awarded as Defamation damages and emotional distress damages are improper and unconstitutional as they are not tied to any established guidelines and were assessed absent substantial physical manifestation of emotional distress.  Further, the awards are grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.

30.     **Unconstitutional and Unlawful Double Counting of Emotional** – the amounts awarded as defamation damages and emotional distress damages are improper as they are duplicative of one another

31.     **Unconstitutional Punishment Damages** – the outrageous and absurd one-half a billion dollars in punitive damages is unconstitutional and resulted from the denial of due process of Jones's rights.  They are grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork even if tied to the inappropriate alleged "compensatory

damages."

32.      **Failure Conditions Precedent – Estoppel** – the Connecticut Plaintiffs are estopped from Domesticating their non-final Connecticut Judgment that is stayed by operation of Connecticut law

33.      **Failure Conditions Precedent – Estoppel** – the Connecticut Plaintiffs are estopped from receiving a turnover of Jones' assets or the appointment of a receiver by: (i) the automatic statutory supersedeas laws of Connecticut; (ii) the statutory supersedeas laws of the State of Texas; and (iii) the automatic stay of the bankruptcy code § 362.

34.      **Offset** – Jones is entitled to offset all damages arising from the actions of the Connecticut Plaintiffs on void orders or judgments entered upon and as a direct result of the denial of due process rights of Alex Jones or as found to be due in the Jones Counterclaims set out herein below.

35.      **Violations of Texas Public Policy** – Jones asserts the Connecticut Judgment is enforceable as it is against Texas public policy.

WHEREFORE, Alex E. Jones prays of for an order and judgment of this Court that the Connecticut Plaintiffs take nothing in their Removed State Court Case, and for such other and further relief to which Alex E. Jones may be entitled, at law or in equity.

## ORIGINAL COUNTERCLAIMS
## OF ALEX E. JONES

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

Defendant and Counterclaim Plaintiff Alexander E. Jones (herein "Alex Jones"), files these counterclaims pursuant to 42 U.S.C.S. §1983 and the United States Constitution as to the various plaintiffs/counterclaim defendants, identified below as the "Connecticut Plaintiffs," seeking among other things, (a) various declarations that the judgment obtained by the Connecticut Plaintiffs against Mr. Jones in Connecticut is invalid and unenforceable as a matter of law as it was knowingly procured in violation of the United States Constitution, (b) injunctive relief precluding the enforcement the Connecticut judgment obtained by the Connecticut Plaintiffs against Mr. Jones as it was procured in knowingly violation of the United States Constitution, and (c) damages for the numerous violations of the civil rights of Mr. Jones, as hereafter set forth.

The Connecticut Plaintiffs filed a Complaint in Connecticut state court (the "Connecticut Complaint") in 2018, nearly 6 years after the Sandy Hook murders had taken place.  That resulted in an unconstitutional judgment against Mr. Jones in the amount of almost **$1,500,000,000** as among the 15 Connecticut Plaintiffs, many of whom were related to one another, such awards breaking down as follows:

| Compensatory Damages Erica Lafferty | | Compensatory Damages William Sherlach | |
|---|---|---|---|
| **TO PLAINTIFF ERICA LAFFERTY:** | | **TO PLAINTIFF WILLIAM SHERLACH:** | |
| A. DEFAMATION/SLANDER DAMAGES (PAST AND FUTURE) | $18,000,000.00 | A. DEFAMATION/SLANDER DAMAGES (PAST AND FUTURE) | $9,000,000.00 |
| B. EMOTIONAL DISTRESS DAMAGES (PAST AND FUTURE) | $58,000,000.00 | B. EMOTIONAL DISTRESS DAMAGES (PAST AND FUTURE) | $27,000,000.00 |
| TOTAL FAIR, JUST AND REASONABLE DAMAGES TO PLAINTIFF ERICA LAFFERTY AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS (ADD LINE A AND LINE B) | $76,000,000.00 | TOTAL FAIR, JUST AND REASONABLE DAMAGES TO PLAINTIFF WILLIAM SHERLACH AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS (ADD LINE A AND LINE B) | $36,000,000.00 |
| Punitive Damages Erica Lafferty: | $40,000,000.00 | Punitive Damages William Sherlach: | $40,000,000.00 |
| **Total Award for Erica Lafferty:** | **$116,000,000.00** | **Total Award for William Sherlach:** | **$76,000,000.00** |

**Compensatory Damages Robert Parker:**

TO PLAINTIFF ROBERT PARKER:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)     $60,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)     $60,000,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF ROBERT
PARKER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)     $120,000,000.00

Punitive Damages Robert Parker:     $40,000,000.00

**Total Award for Robert Parker:     $160,000,000.00**

---

**Compensatory Damages Jennifer Hensel:**

TO PLAINTIFF JENNIFER HENSEL:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)     $21,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)     $31,000,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JENNIFER
HENSEL, AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)     $52,000,000.00

Punitive Damages Jennifer Hensel:     $17,330,000.00

**Total Award for Jennifer Hensel:     $69,330,000.00**

---

**Compensatory Damages David Wheeler:**

TO PLAINTIFF DAVID WHEELER:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)     $25,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)     $30,000,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF DAVID
WHEELER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)     $55,000,000.00

Punitive Damages David Wheeler:     $18,330,000.00

**Total Award for David Wheeler:     $73,330,000.00**

---

**Compensatory Damages Francine Wheeler:**

TO PLAINTIFF FRANCINE WHEELER:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)     $24,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)     $30,000,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF FRANCINE
WHEELER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)     $54,000,000.00

Punitive Damages Francine Wheeler:     $18,000,000.00

**Total Award for Francine Wheeler:     $72,000,000.00**

---

**Compensatory Damages Mark Barden:**

TO PLAINTIFF MARK BARDEN:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)     $25,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)     $32,600,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF MARK
BARDEN AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)     $57,600,000.00

Punitive Damages Mark Barden:     $19,200,000.00

**Total Award for Mark Barden:     $76,800,000.00**

---

**Compensatory Damages Jacqueline Barden:**

TO PLAINTIFF JACQUELINE BARDEN:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)     $10,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)     $18,800,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JACQUELINE
BARDEN AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)     $28,800,000.00

Punitive Damages Jacqueline Barden:     $9,600,000.00

**Total Award for Jacqueline Barden:     $38,400,000.00**

**Compensatory Damages Ian Hockley:**

TO PLAINTIFF IAN HOCKLEY:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE) .......... $38,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE) .......... $43,600,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF IAN
HOCKLEY AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B) .......... $81,600,000.00

Punitive Damages Ian Hockley:     $27,200,000.00

**Total Award for Ian Hockley:     $108,800,000.00**

---

**Compensatory Damages Nicole Hockley:**

TO PLAINTIFF NICOLE HOCKLEY:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE) .......... $32,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE) .......... $41,600,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF NICOLE
HOCKLEY AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B) .......... $73,600,000.00

Punitive Damages Nicole Hockley:     $24,530,000.00

**Total Award for Nicole Hockley:     $98,130,000.00**

---

**Compensatory Damages Carlos Mathew Soto:**

TO PLAINTIFF CARLOS MATHEW SOTO:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE) .......... $18,600,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE) .......... $39,000,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF CARLOS
MATHEW SOTO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B) .......... $57,600,000.00

Punitive Damages Carlos Mathew Soto:   $19,200,000.00

**Total Award for Carlos Mathew Soto:     $76,800,000.00**

---

**Compensatory Damages Donna Soto:**

TO PLAINTIFF DONNA SOTO:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE) .......... $18,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE) .......... $30,000,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF DONNA
SOTO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B) .......... $48,000,000.00

Punitive Damages Donna Soto:     $16,000,000.00

**Total Award for Donna Soto:     $64,000,000.00**

---

**Compensatory Damages Carlee Soto Parisi:**

TO PLAINTIFF CARLEE SOTO PARISI:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE) .......... $30,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE) .......... $36,000,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF CARLEE
SOTO PARISI AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B) .......... $66,000,000.00

Punitive Damages for Carlee Soto Parisi:   $22,000,000.00

**Total Award for Carlee Soto Parisi:     $88,000,000.00**

---

**Compensatory Damages Jillian Soto-Marinio:**

TO PLAINTIFF JILLIAN SOTO-MARINO:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE) .......... $30,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE) .......... $38,800,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JILLIAN
SOTO-MARINO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B) .......... $68,800,000.00

Punitive Damages Jillian Soto-Marinio:   $22,930,000.00

**Total Award for Jillian Soto-Marinio:     $91,730,000.00**

Compensatory Damages William Aldenberg:

**TO PLAINTIFF WILLIAM ALDENBERG:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $45,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
   (PAST AND FUTURE)                    $45,000,000.00

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF WILLIAM
ALDENBERG AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**             $90,000,000.00

Punitive Damages William Aldenberg: $30,000,000.00

**Total Award for William Aldenberg:   $120,000,000.00**

A near identical complaint has been filed initiating an adversary proceeding in Texas to collect that judgment (the Adversary Complaint"). The Connecticut Complaint (and its ensuing judgment) and the Adversary Complaint filed in Texas to collect on that judgment effectively put Mr. Jones out of business and silence him – forever.

However, the Connecticut Complaint and ensuing judgment the Adversary Complaint seeks to enforce, are unconstitutional. Further, their procurement and enforcement violates 42 U.S.C.S. §1983 and the United States Constitution. In brief summary, which the trial of this Counterclaim will demonstrate, under black-letter ironclad United States Supreme Court mandates, certain Constitutional requirements were to be afforded Mr. Jones but which the Connecticut Plaintiffs worked together with the state judiciary to deny Mr. Jones. These protections include the following impregnable and unassailable requirements:

1.      The Connecticut Plaintiffs, were required to prove to a jury by clear and convincing evidence, that Mr. Jones acted with actual malice as to each and every alleged libelous statement he was accused of making, whereas the Connecticut Plaintiffs procured the abrogation of that right.

- "…under this Court's First Amendment jurisprudence, [the Connecticut Plaintiffs] cannot establish libel without proving by clear and convincing evidence that [Mr.

Jones] acted with actual malice—that is with knowledge that the published material was false or with reckless disregard of whether it was false." *Berisha v. Lawson*, 141 S. Ct. 2424, 2424 (2021) (*citing New York Times Co. v. Sullivan*, 376 U. S. 254, 280, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964); *Gertz v. Robert Welch, Inc.*, 418 U. S. 323, 334-335, 342, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974); and *Curtis Publishing Co. v. Butts*, 388 U. S. 130, 155, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967).

- "The First Amendment limits California's libel law in various respects. When, as here, the plaintiff is a public figure, he cannot recover unless he proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice, i. e., with knowledge that it was false or with reckless disregard of whether it was false or not. Mere negligence does not suffice. Rather, the plaintiff must demonstrate that the author "in fact entertained serious doubts as to the truth of his publication." *Masson v. New Yorker Magazine*, 501 U.S. 496, 510, 111 S. Ct. 2419, 2429 (1991) (*citing New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964)).

2.      A Constitutionally required finding of "malice" is not an objective one, but a *subjective* one focusing on what Mr. Jones himself believed, which the Connecticut Plaintiffs convinced the Connecticut court to ignore in violation of those Constitutional rights:

- Under this rule, absent knowing falsehood, liability requires proof of reckless disregard for truth, that is, that the defendant in fact entertained serious doubts as to the truth of his publication.  Such subjective awareness of probable falsity, may be found if there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Herbert v. Lando,* 441 U.S. 153, 156-57, 99 S. Ct. 1635, 1639 (1979) (internal citations and quotations omitted) (*citing St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 335 n. 6 (1974)).

3.      A fact finder must have actually made the determination of malicious libel; it cannot be presumed which the Connecticut Plaintiffs convinced the Connecticut court to ignore and presume malice.

- Even where a question of fact may have constitutional significance, we normally accord findings of state courts deference in reviewing constitutional claims here. But that deference is predicated on our belief that at some point in the state proceedings some factfinder has made a conscious determination of the existence or nonexistence of the critical fact. Here the record before us affords no basis for such a conclusion." *Time, Inc. v. Firestone*, 424 U.S. 448, 463, 96 S. Ct. 958, 969-70 (1976) (*citing Lyons v. Oklahoma*, 322 U.S. 596, 602-603 (1944); *Gallegos v. Nebraska*, 342 U.S. 55, 60-

61 (1951)).

4.    Punitive damages can only be awarded after complying with the standards of *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964) which the Connecticut Plaintiffs convinced the Connecticut court to ignore:

- They are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence. In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated by New York Times may recover only such damages as are sufficient to compensate him for actual injury."   *Gertz v. Robert Welch*, 418 U.S. 323, 350, 94 S. Ct. 2997, 3012 (1974)

5.    Constitutional libel limitations apply to state law claims of intentional infliction of emotional distress which the Connecticut Plaintiffs convinced the Connecticut court to ignore:

- "We conclude that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with actual malice, i.e., with knowledge that the statement was false or with reckless disregard as to whether or not it was true. This is not merely a blind application of the New York Times standard, … it reflects our considered judgment that such a standard is necessary to give adequate breathing space to the freedoms protected by the First Amendment."   *Hustler Magazine v. Falwell*, 485 U.S. 46, 56-57, 108 S. Ct. 876, 882 (1988)

6.    An alleged libeler cannot be liable for the violent acts of others that the libeler did not specifically and subjectively intend to incite with his libelous speech which the Connecticut Plaintiffs convinced the Connecticut court to ignore judicially holding him responsible for the damages, if any, caused by completely unrelated third parties:[4]

---

[4] Although it must be clearly understood that there was no evidence or even an allegation that Mr. Jones ever one-time urged violence; rather, the Connecticut Plaintiffs simply claimed that unrelated third parties harassed them.  As will be discussed *infra*, this does not even approach the Constitution's protections where speakers do actually encourage violence.  *See Brandenburg v. Ohio*, 395 U.S. 444 (dealing with KKK threats of vengeance); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 928, 102 S. Ct. 3409, 3434 (1982) (stating with reference to civil rights activist Medgar Evers, "[s]trong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech. To rule otherwise would ignore the "profound national commitment" that "debate on public issues should be uninhibited, robust, and wide-open."); *Watts v. United States*, 394 U.S. 705 (reversing the conviction of a person drafted for

- "This Court has made clear, however, that mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment. In Brandenburg v. Ohio, 395 U.S. 444, we reversed the conviction of a Ku Klux Klan leader for threatening "vengeance" if the "suppression" of the white race continued; we relied on the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *NAACP v. Claiborne Hardware Co*., 458 U.S. 886, 927-28, 102 S. Ct. 3409, 3433 (1982) (*citing Brandenburg v. Ohio*, 395 U.S. 444, 444, 89 S. Ct. 1827, 1828 (1969) *and Noto v. United States*, 367 U.S. 290, 297, 81 S. Ct. 1517, 1520 (1961) [( the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action"]).

And there are other Constitutional protections the Connecticut Plaintiffs succeeded in convincing a Connecticut state court judge to trample when they convinced her to punish Alex Jones and judicially decree with no proof required, that a jury of six Connecticut citizens would be instructed, among other things, that Alex Jones acted with actual subjective malice and the Connecticut Plaintiffs need offer no proof of such, let alone by "clear and convincing evidence" and that Alex Jones was personally responsible for everything any third party said or did including harassment of any of the Connecticut Plaintiffs by third parties completely unaffiliated with Alex Jones.

The United States Supreme Court has stated the First Amendment "guarantees have consistently refused to recognize an exception for any test of truth -- whether administered by judges, juries, or administrative officials -- and especially one that puts the burden of proving truth on the speaker.*"* *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271, 84 S. Ct. 710, 721 (1964). But the Connecticut Plaintiffs convinced the Connecticut judge to toss this on the garbage heap and replace it with a judicial fiat declaring complete liability, leaving only the determination of damages --

---

Vietnam who said "…if they ever make me carry a rifle the first man I want to get in my sights is L. B. J." dismissing it as "a kind of very crude offensive method of stating a political opposition to the President."

which the Connecticut Plaintiffs urged an unhinged and unguided jury to assess for essentially "mental anguish" at over $1,500,000,000.

And there were three reasons the Connecticut Plaintiffs urged, and the Connecticut judge accepted, for these unprecedented unconstitutional acts:

1.  Alex Jones's lawyers had the temerity to simply ask the Connecticut court for permission to depose Hillary Clinton whom Mr. Jones contended was behind the Connecticut Plaintiffs' suit as a part of achieving a "gun control" political agenda that targeted him.  While the Connecticut court denied the request it sanctioned Mr. Jones because his team asked;

2.  Alex Jones's lawyers could not retrieve never-used Google Analytics data showing the number of vitamin supplement sales made during broadcasts when the subject of a media broadcast mentioned Sandy Hook. [5]

3.  Alex Jones's lawyers could not retrieve in a form and format to the liking of the Connecticut Plaintiffs, accounting "subaccounts" from their accounting journal entries, again which the Connecticut Plaintiffs presumably hoped to use to show a profit motive, which is irrelevant to whether a media defendant has been proven to have committed malicious libel.

That these are the three – and only three – reasons such judicial "death penalty" was rendered is not in dispute.  The transcript of the November 15, 2021, hearing where this death penalty was judicially levelled is attached hereto as **Exhibit A**.[6]  But it resulted in one of the most unprecedented and knowing acts of constitutional defiance in the annals of modern constitutional jurisprudence.

---

[5] This even though the Supreme Court has plainly stated profit motive has nothing to do with malicious libel.  *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667, 109 S. Ct. 2678, 2686 (1989) ("If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels.")

[6] And not only were these death penalty sanctions judicially rendered, the Connecticut Plaintiffs successfully urged the Connecticut court to not allow Mr. Jones to defend that he did not profit in any material way from any Sandy Hook related-broadcast.  This amounted to putting a bullet in the brain pan of an already dead defense.

As direct result of these violations of Mr. Jones's civil rights, his business has been decimated resulting in significant financial losses due to the acts of the Connecticut Plaintiffs for which they must now be held accountable.

## I.
## PARTIES

The Counterclaim Plaintiffs who are Defendants in this counterclaim are David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, Williams Aldenberg, William Sherlach, Robert Parker, and Erica Ash (formerly Erica Lafferty) (previously defined collectively the "Connecticut Plaintiffs")

## II.
## JURISDICTION AND VENUE

Jurisdiction exists pursuant to §§ 28 U.S.C. 1332, 1334, §1441(a), (b)(2), 1442, and 1452(a).  Additionally, jurisdiction exists because the Connecticut Plaintiffs initiated an Adversary Proceeding in the bankruptcy court requesting that the Bankruptcy Court find that the Connecticut Judgment be determined non-dischargeable.   Specifically, the Connecticut Plaintiffs filed a 40 page complaint (the "Complaint") attached to which are either specifically attached or incorporated by reference, "[t]he record leading to the Connecticut Judgment ,… filings by Plaintiffs and Alex Jones, rulings by the Connecticut trial court and Connecticut Supreme Court and a jury verdict following the damages trial."   They then filed a motion for summary judgment.

## III.
## BACKGROUND FACTS

**A.    ALEX JONES IS A MEDIA DEFENDANT ENTITLED TO ALL FIRST AMENDMENT PROTECTIONS**

Alex Jones is a media defendant.  Recognized by both supporters and critics, Jones has been at the forefront of media for nearly three decades, with his career spanning radio, online broadcasting, film, and commentary. Though some controversies have followed him, Jones has maintained his dedication to free speech and individual rights, positioning himself as a steadfast proponent of questioning mainstream narratives.  The Connecticut Plaintiffs readily admit this. As such he is entitled to, but was denied, all the Constitutional protections afforded media defendants. While it may come as a surprise to some, until sued by the Connecticut Plaintiffs and their associates in Texas based on the Sandy Hook tragedy, Jones had never been in any significant lawsuits.

Currently, he hosts The Alex Jones Show from Austin, Texas, which is the longest-running online news and politics talk show today and was previously broadcast by the Genesis Communications Network across the United States via syndicated and internet radio.

### *Early life and influences*

Alex Jones was born on February 11, 1974, in Dallas, Texas, and was raised in Rockwall, 25 miles east of Dallas.  His family moved to Austin in Jones's sophomore year of high school. He attended Anderson High School, and briefly attended Austin Community College. Jones's formative years in Texas—along with the state's emphasis on personal liberty—helped shape his views on individual rights, government, and media freedom

### *Early broadcasting career*

Jones began his career in Austin working on a live, call-in format public-access cable television program, focusing on issues such as property rights, personal freedoms, and Second Amendment advocacy. His approach resonated with a Texan audience sensitive to libertarian values and government accountability.

In 1996, Jones transitioned to radio, hosting a show named The Final Edition on KJFK (98.9 FM).   Influenced by Congressman Ron Paul and Rush Limbaugh, Jones began to broadcast about the New World Order conspiracy theory at this time. In 1999, Jones tied with Shannon Burke for that year's poll of "Best Austin Talk Radio Host", as voted by readers of The Austin Chronicle. Within a few years, by 1998 a syndicator put all of Jone's shows throughout the country.  Jones has a huge following of viewers espousing mainly a Libertarian, individual perspective that leans more towards younger listeners.

In about 1999, Jones founded the website InfoWars, initially as a news site for the sale of their videos and documentary films.  Over time, InfoWars, with Jones as its publisher and director, became a prominent website centered on promoting conspiracy theories.  By 2000 he was on over 100-150 radio stations nation-wide interviewing people and becoming the pioneer of talk radio and what is now podcasting.

In 2010, the show attracted around two million listeners each week.   By 2011 Jones had a larger on-line audience than Glenn Beck and Rush Limbaugh combined.

On 2013, Jones appeared as a guest on the BBC's Sunday Politics, discussing conspiracy theories about the Bilderberg Group, with presenter Andrew Neil and journalist David Aaronovitch and was invited to speak on Piers Morgan's CNN.

In November 2016, the InfoWars website received approximately 10 million visits a week, making its reach more extensive than mainstream news websites such as The Economist and Newsweek. Another of Jones's websites is PrisonPlanet.com and his radio show, then syndicated to 129 stations, had a daily audience of five million listeners and his video streams had topped 80 million viewers in a single month.

In 2020, The Alex Jones Show was syndicated nationally by the Genesis Communications Network to more than 100 AM and FM radio stations in the United States.

### ***Guests Interviewed***

Jones's guest list continues to expand into the realms of politics, alternative medicine, and global policy. Each interview tends to add another layer to his often-controversial discussions. These guests span different political, social, and alternative perspectives, fitting the variety of topics Jones discusses.  A non-exclusive list of guests are:

1. Donald Trump
2. Elon Musk
3. Daniel Ellsberg
4. Tucker Carlson
5. Ray McGovern former CIA officer
6. Many US Senators and Congressmen
7. Joe Rogan – Podcast host and commentator known for The Joe Rogan Experience
8. David Icke – Conspiracy theorist and author known for his theories on global elites and reptilian beings
9. Ron Paul – Former Congressman and presidential candidate known for his libertarian views
8. Andrew Napolitano – Former judge and Fox News analyst
9. Steve Bannon – Former White House Chief Strategist and executive chairman of Breitbart News
10. Paul Joseph Watson – British commentator and writer known for his work with Infowars
11. Dr. Stella Immanuel – Physician who became widely known for her views on COVID-19 and hydroxychloroquine
12. Robert F. Kennedy Jr. – Environmental attorney and activist, also known for his views on vaccines
13. Milo Yiannopoulos – Political commentator known for his controversial views and association with the alt-right
14. Charlie Sheen – Actor who appeared to discuss conspiracy theories, including those about 9/11
15. Jesse Ventura – Former Governor of Minnesota and conspiracy theorist
16. Edward Griffin – Author of The Creature from Jekyll Island, known for his views on the Federal Reserve
17. Matt Drudge – Founder of The Drudge Report, who rarely gives interviews
18. Jordan Maxwell – Researcher known for his theories on religion, secret societies, and the occult
19. Roseanne Barr – Comedian and actress who has discussed her own views on the entertainment industry and politics

20. Gavin McInnes – Co-founder of Vice and founder of the Proud Boys
22. Anthony Cumia – Radio personality known from the Opie and Anthony show
23. William Binney – Former NSA official and whistleblower who spoke about government surveillance
24. Jerome Corsi – Political commentator and author involved in various conspiracy theories
25. James O'Keefe – Founder of Project Veritas, known for undercover journalism
26. Mike Cernovich – Social media personality and author with a focus on political activism
27. Roger Stone – Political consultant and former advisor to Donald Trump, frequently interviewed about politics and his legal battles
28. Nigel Farage – British politician known for his role in Brexit and leadership of the UK Independence Party (UKIP)
29. Dr. Andrew Wakefield – Disgraced British doctor known for his controversial study linking vaccines and autism
30. Alexandra Bruce – Writer and researcher known for her work on alternative science and conspiracy theories
31. Robert David Steele – Former CIA officer and advocate of open-source intelligence and various conspiracy theories
32. Larry Elder – Conservative talk radio host and former California gubernatorial candidate
33. David Knight – Former Infowars host who frequently discussed constitutional issues and civil liberties
34. Rand Paul – U.S. Senator from Kentucky and prominent libertarian-leaning politician
35. Michael Savage – Conservative radio host and author
36. Pat Buchanan – Political commentator, author, and former presidential candidate
37. Lord Christopher Monckton – British politician and climate change skeptic
38. Tommy Robinson – British far-right activist and former leader of the English Defence League (EDL)
39. George Galloway – British politician and broadcaster, known for his outspoken views on international issues
40. Ann Coulter – Conservative commentator and author
41. Alan Watt – Researcher known for his commentary on social engineering and globalist agendas
42. Marjorie Taylor Greene – U.S. Congresswoman known for her outspoken views on several conspiracy theories
44. Louis Farrakhan – Leader of the Nation of Islam, who has shared alternative perspectives on history and society
45. Stefan Molyneux – Philosopher and commentator known for controversial views on race, gender, and culture
46. Jon Rappoport – Investigative journalist known for his writings on medical freedom and alternative health
47. Tom Fitton – President of Judicial Watch, often discusses government transparency and accountability
48. Adam Kokesh – Libertarian activist and former Marine

49.   Jim Marrs – Journalist and author known for his work on 9/11, UFOs, and the JFK assassination
50.   Richard Gage – Architect and founder of Architects & Engineers for 9/11 Truth
51.   Peter Schiff – Economist and financial commentator
52.   Sargon of Akkad (Carl Benjamin) – British YouTuber and political commentator
53.   Randall Carlson – Geologist and researcher known for his theories on ancient civilizations and catastrophism
54.   Cynthia McKinney – Former U.S. Congresswoman with outspoken views on government transparency and military issues
55.   Clif High – Internet entrepreneur and writer known for his "web bot" predictions
56.   Neal Fox – Musician and filmmaker known for his libertarian and anti-establishment views
57.   Dr. Russell Blaylock – Retired neurosurgeon who has discussed the effects of vaccines and processed foods on health
58.   Richard Belzer – Actor and conspiracy theorist, known for his interest in the JFK assassination and other topics
59.   Vani Hari (Food Babe) – Activist focused on food ingredients and safety
61.   Ed Asner – Actor and political activist, who discussed his views on government and corporate power
62.   Rob Dew – Journalist and producer at Infowars, frequently joining for news segments and commentary
63.   Michael Scheuer – Former CIA officer and analyst known for his views on U.S. foreign policy and counter-terrorism
64.   Dr. Sherri Tenpenny – Osteopathic physician who discusses vaccine skepticism
65.   Larry Nichols – Political consultant and former Clinton advisor who shared various conspiracy theories about the Clintons
66.   Ames Wesley Rawles – Survivalist and author known for his work on preparedness and self-sufficiency
67.   Dr. Judy Mikovits – Research scientist who became prominent in the anti-vaccine movement
68.   Mark Dice – Media analyst and YouTuber known for his satirical and conservative commentary
69.   Pat Riley – Financial analyst and commentator on economics and government policy
70.   John B. Wells – Radio host and conspiracy theorist, formerly of Coast to Coast AM
71.   Lyn Ulbricht – Mother of Ross Ulbricht, founder of the Silk Road marketplace, who advocates for criminal justice reform
72.   Dr. Rima Laibow – Psychiatrist and medical doctor who discusses natural health and regulatory issues
73.   Texe Marrs – Pastor and author known for his conspiracy theories and religious beliefs
74.   Max Keiser – Financial commentator and Bitcoin advocate

## *Interview Topics*

Jones has covered major issues of the day including issues associated with 911 which he predicted.  Jones covered the falsification of weapons of mass destruction that prompted the Iraq invasion.   Interviews occur on controversial subjects like government surveillance, privacy medical freedom and vaccination (Covid mandates), globalism in the New World order, 911 conspiracy theories, UFOs, climate change, secret societies in the tech industry, free speech.

Alex Jones's Infowars has covered a vast array of subjects over the years, often with a focus on controversial or alternative perspectives. Here's a rundown of some of the major subjects frequently discussed on the show:

1. Government Surveillance and Privacy, covering topics like the NSA's data collection, Big Tech's role in monitoring citizens, and alleged government tracking methods.
2. Medical Freedom and Vaccine Skepticism where Jones and guests often discuss issues around mandatory vaccinations, alternative health treatments, and concerns about pharmaceutical industry practices.
3. Globalism and the New World Order, covering claims around secret plans by global elites to form a one-world government, often labeled the "New World Order."
4. 9/11 Conspiracy Theories, covering claims around  the idea that the 9/11 attacks were an "inside job," focusing on perceived inconsistencies in the official narrative.
5. UFOs and Extraterrestrial Life covering discussions about alien life, government cover-ups of UFO sightings, and Area 51 conspiracies.
6. Financial System and Federal Reserve Criticism covering issues and critiques about the Federal Reserve, fiat currency, and what he views as manipulation of the financial system by elites.
7. COVID-19, Health Mandates, and Medical Tyranny addressing theories around the origins of COVID-19, opposition to lockdowns, and skepticism about government and pharmaceutical responses to the pandemic.
8. The Deep State addressing the idea that there is a shadow government (the "Deep State") operating independently of elected officials to push certain agendas.
9. Climate Change Skepticism frequently challenges mainstream scientific consensus on climate change, with claims it's exaggerated to control populations or promote globalist agendas.
10. Secret Societies and Occult Influence addressing claims about the influence of groups like the Illuminati, Freemasons, and Skull & Bones on world events and cultural direction.
11. Big Tech Censorship and Free Speech addressing how social media companies and Big Tech allegedly censor conservative and alternative voices.
12. Second Amendment Rights and Gun Control addressing strong advocacy for the right to bear arms, with critiques of gun control measures as threats to personal freedom.

13. Cultural and Political "Wokeness" discussing what guests see as the dangers of "woke culture" and political correctness, especially in media and education.

14. Ancient Civilizations and Hidden History addressing theories and speculation on advanced ancient civilizations and lost knowledge, as well as the suppression of alternative historical narratives

15. Transhumanism and Technological Control Addressing concerns about artificial intelligence, human enhancement technology, and the potential for elites to use technology for control.

16. Psychological Operations and Media Manipulation addressing discussions around how governments and corporations use media and psychological operations (or "psy-ops") to control public perception and influence behavior.

17. Mind Control and MK-Ultra, addressing theories around historical CIA mind control experiments and the possibility of ongoing psychological manipulation techniques.

18. Social Engineering and Population Control addressing claims that powerful entities engage in social engineering, manipulating society's structure, norms, and values, sometimes tied to eugenics or population reduction theories.

19. Suppression of Alternative Medicine and Natural Health addressing issues associated with arguments that natural and alternative treatments are suppressed to benefit the pharmaceutical industry.

20. Space Programs and Secret Technology, addressing theories and speculation on secret government space programs, including alleged advanced technologies kept hidden from the public.

21. Weather Modification and Geoengineering, addressing theories around deliberate climate and weather manipulation through geoengineering, such as "chemtrails" and HAARP.

22. Child Trafficking and Elite Networks addressing allegations of child trafficking networks involving powerful individuals, often framed as part of broader political scandals.

23. Cryptocurrency and Financial Independence which include discussions around Bitcoin, alternative currencies, and their potential as tools for freedom from traditional banking systems.

24. Artificial Intelligence and the Rise of the Machines addressing concerns about AI potentially surpassing human intelligence and the ethical and existential risks of robotics and automation.

25. Hollywood and Entertainment Industry Influence. Addressing theories that Hollywood and the music industry promote certain agendas, often involving occult symbolism or social engineering

26. Pedogate and Alleged Cover-ups of High-Level Abuse addressing speculation that certain political or entertainment elites are involved in abusive practices covered up by networks of power.

27. False Flag Operations, discussing events believed to be "false flags," or staged incidents designed to justify government actions or manipulate public opinion.

28. Cultural Marxism and Ideological Subversion addressing the theory that cultural institutions are infiltrated to shift society toward Marxist or socialist ideals, allegedly to destabilize Western countries.

29. Human-Animal Hybrids and Genetic Experimentation, addressing theories about alleged experiments blending human and animal DNA or genetically modifying humans, typically discussed as bioethics concerns.

30. Agenda 21 and Sustainable Development, addressing claims that UN's Agenda 21 is a plan to centralize control over land and resources under the guise of environmental sustainability.

These subjects are often discussed from a skeptical, libertarian, or populist perspective, with emphasis on questioning mainstream narratives.

### *Deep State*

Jones frequently analyzes the "Deep State," referring to an alleged network of powerful, unelected individuals within government agencies who, according to him, exert control over policy and public perception independently of elected officials. This concept remains central to his discourse, resonating with audiences wary of centralized power.

### *Donald Trump*

On December 2, 2015, Donald Trump, then a presidential candidate, appeared on The Alex Jones Show, with Trump stating to Jones at the end: "your reputation is amazing. I will not let you down. You'll be very, very impressed, I hope."  Jones and Trump both said the appearance was arranged by Roger Stone, who made multiple appearances on Jones' program during the 2016 presidential campaign.  During his 2016 presidential campaign, via his Twitter account, Trump linked to InfoWars articles.  In one of her own speeches and video ads, Clinton criticized Trump for his ties to Jones.  Trump called Jones on the day after the election to thank him for his help in the campaign.

### *Second Amendment Rights*

Jones has been a staunch supporter of the Second Amendment, emphasizing the importance of individual rights in public debates about gun ownership and regulation. His views align with those of his libertarian audience, underscoring his belief in the right to personal freedom and self-defense

_**Other Media-Based Activities**_

Aside from being a news casting media personality, Mr. Jones has appeared in movies. Including some produced by Richard Linkletter, the filmmaker, who put Mr. Jones in movies with some notable actors like Keanu Reeves and Woody Harrelson.  He has also produced his own films, including the Jones film Endgame: Blueprint for Global Enslavement.

### B.    SANDY HOOK TRAGEDY

Just before 9:30 AM on December 14, 2012, Adam Lanza shot his way into a locked school in Newtown Connecticut at Sandy Hook elementary school, with a Bushmaster XM15-E2S.   He thereupon shot and killed 20 first-grade children and 6 adults, wounding two others.  The tragedy left behind not only several devastated families but an entire nation.  In the ensuring chaos and fog of devastation, several elements of society including the press sought to rush in, some to render help and others to use this tragedy as an opportunity to push for gun control.  While the deaths of the victims were clear, in the ensuing chaos many things happened and/or were reported, that created confusion in the eyes of certain members of the public.   Particularly given the presence of some members of a "political" press, events which may have been innocent or easily explained were not explained and this gave rise to a significant number of people across the country who began to ask questions.   Many of those questions were treated as acts of disrespect, not worthy of answers, which in turn led to a growing concern that the entire story of the Sandy Hook massacre had not been told.  Some went so far as to claim that the entire event had been staged, which was particularly sensitive to a large segment of the population who had seen the US government present "overwhelming evidence" that Iraq was manufacturing weapons of mass destruction for use against the world, only to find out the entire story that cost our beloved nation trillions of dollars and countless lives, was fabricated.  Others did not go so far but continued to ask questions.  Suffice

it to say, stories all across the spectrum were circulated and news reporters and news sources continually pounded the story, many seeing it as an opportune time for advancement of the gun control agenda vehemently resisted by other portions of our nation.  Alex Jones was among those who initially merely asked questions, such why CNN reporter Anderson Cooper who was allegedly on site was operating behind a greenscreen such that his nose would disappear when he would move?  Or why did one of the victim's family members seem to be reading from prepared prompt cards?   Unlike others, Mr. Jones was never skeptical that people had been killed; his initial skepticism rather was focused on secondary aspects that were to him confusingly inconsistent with a mass murder scene.  Ultimately Mr. Jones acknowledged the tragic deaths and abandoned his questions of the ancillary aspects of the tragedy.

C.    AFTERMATH OF SANDY HOOK TRAGEDY – THE CONNECTICUT PLAINTIFFS BECOME PUBLIC FIGURES

Suffice it to say, the Sandy Hook tragic murders captivated the entire world. In the United States alone, major news outlets such as The New York Times, The Washington Post, CNN, and NBC News, alongside numerous local papers and online publications, produced extensive coverage immediately following the incident and, in the years, since.  Although it is impossible to say with precision, estimates are that at least 10,000 to 20,000 articles were generated within the U.S. about this.  Globally, Sandy Hook coverage extended to major international news organizations, including BBC, Al Jazeera, The Guardian, Le Monde, and The Sydney Morning Herald, along with other regional publications.   International reporting likely produced an additional 5,000 to 10,000 articles initially, with periodic follow-ups and anniversary reports.

The Sandy Hook tragedy quickly morphed into the signature driving force for gun control.  This perhaps initially started with most of the Connecticut Plaintiffs suing Remington Arms, the manufacturer of the weapon used by the murderer.  It was a highly publicized suit in which case

many of the Connecticut Plaintiffs who joined that suit received $73,000,000 in settlement in part for their "pain and suffering" and "destruction of the ability to enjoy life's activities."

Since 2012 and prior to the suit herein filed, the Connecticut Plaintiffs have given scores of public interviews and/or made statements and/or formed or joined advocacy campaigns, many through organizations or initiatives they founded to prevent similar tragedies.   Some of the Connecticut Plaintiffs were invited to attend President Barack Obama's 2013 State of the Union address as guests, a gesture that highlighted their gun control advocacy.   There President Barack Obama advocated for gun reform following the tragedy, where President Obama after paying tribute to the Connecticut Plaintiffs called for Congress to act on gun violence prevention.

Nicole Hockley and Mark Barden were among the parents who worked closely with the Obama administration on these issues and were publicly recognized in various ways as part of the administration's push for change in gun policy.

Based on public records and media coverage David and Francine Wheeler were asked to substitute for President Obama himself in his weekly, nationally televised address:



At the 2016 Democratic National Convention Erica Lafferty (her maiden name) gave a five-minute speech on gun control and Hillary Clinton, and was shown in close support of Secretary Clinton given her positions on gun control:



Nicole Hockley and Ian Hockley, were active in the media and co-founded Sandy Hook Promise, speaking widely about gun reform.  Mark Barden and Jacqueline Barden frequently gave interviews and public statements; Mark Barden is also a prominent figure in Sandy Hook Promise. Jennifer Hensel and Jeremy Richman were vocal advocates for mental health awareness. Jeremy Richman founded the Avielle Foundation, often speaking publicly about the connection between mental health and violence.  William Sherlach joined in advocacy for changes in gun laws and mental health reform.  Francine Wheeler gave a widely broadcasted speech and is involved in advocacy.  Carlee Soto-Parisi and Jillian Soto, Sisters of teacher Victoria Soto, who became vocal advocates for gun reform and school safety, participated in marches and public forums.

The Connecticut Plaintiffs decided to continue to draw attention to the tragedy using Alex Jones as the human pinata to advance their two-fold agenda.  One aspect of their agenda, on information and belief, was the concerted action with significant political opponents of Mr. Jones, to embark on a plan to silence him and remove him from the airwaves.  Thus, in 2018, Jones was on information and belief, due to the efforts of the Connecticut Plaintiffs, removed from YouTube; Facebook suspended his profile; Stitcher Radio removed all of his podcasts; Facebook, Apple, YouTube and Spotify removed all content by Jones and InfoWars.  YouTube removed channels associated with InfoWars, including The Alex Jones Channel.  He was also removed from Pinterest, Mailchimp, and LinkedIn.  He was also permanently banned from Twitter and Periscope. The InfoWars app was removed from the Apple App Store for "objectionable content."  He was banned from using PayPal for business transactions.  In 2019, YouTube terminated other news sources for reuploading of live streams from InfoWars.  In March 2020, the InfoWars app was removed from the Google Play store.  After Elon Musk's purchase of Twitter, several previously banned accounts were reinstated including Mr. Jones.

The second prong of their attack on Mr. Jones, was filing suit 18 miles from the small community where the tragedy had occurred and where local sensitivities were still raw.  That their goal was to remove Alex Jones from the airwaves was repeated by the lawyers for the Connecticut Plaintiffs in their opening and closing statements and throughout the trial.   But the trial was an unfair, partisan attack not just on Alex Jones but on the Constitution of the United States by both the Connecticut Plaintiffs and an aligned judicial system.

### D.   UNCONSTITUTIONAL DEATH PENALTY SANCTIONS ENTERED

This desecration of Mr. Jones rights occurred when the Connecticut Plaintiffs urged, and the Connecticut trial court agreed that Mr. Jones would not be able to defend himself or even explain

himself.  The Connecticut Plaintiffs urged, and the Connecticut trial court agreed that the jury of six Connecticut citizens would be instructed that Mr. Jones had intentionally and maliciously committed every act that the Connecticut Plaintiffs accused him of – no matter how farfetched and in some cases preposterous, as will be discussed infra, and Mr. Jones could literally say nothing in his own defense.

Why the Court do this is not a matter of speculation or "conspiracy theory," and we need not guess or speculate as to why the Connecticut Court removed all of Mr. Jones's Constitutional rights.  **The Connecticut Court held a hearing on November 15, 2021 (the transcript is attached as Exhibit A hereto) and articulated the reasons for her order of death to the US Constitution**.  The transcript recites that there were only three reasons, each of which was either a mischaracterization of the record, clearly erroneous or an outright abuse of discretion.

*Reason Number 1: Alex Jones's Lawyers Asked For Permission To Depose Hillary Clinton*

First, the Court referred to Mr. Jones's counsel's "cavalier actions" regarding their motion to depose Hillary Clinton, that amounted, in the Court's view, to "willful misconduct."  A protective order had been entered in the case and that is attached hereto as **Exhibit B.**  It clearly provides that information covered could be used for the preparation and trial of this case.  As the plaintiffs' depositions began, it became apparent that plaintiffs' counsel would resist any testimony about how the plaintiffs all happened to find themselves in the same law office six years after the Sandy Hook shootings. It was Mr. Jones' belief that the prosecution of him was orchestrated by those motivated to have their revenge on him for his support of Donald Trump's successful campaign – Mr. Trump appeared as a guest on one of Mr. Jones' broadcast during the campaign-- against Hillary Clinton in 2016. To that end, counsel for Mr. Jones sought a commission to take the deposition of Ms. Clinton, then a resident of New York. In the motion for a commission, Mr.

Jones's counsel explained why Clinton's deposition was being sought explaining that at a deposition a witness was instructed by counsel not to answer questions about choice of counsel or who was financing the litigation. The name and gender of the deponent were not mentioned; the deposition was characterized, not quoted. The trial court took grave exception to this, referring to it as "frightening." The judge not only denied the request, but she found the conduct involving the pleading so significant it was the first of the three errors that lead to the death penalty. It makes no sense to render a death penalty killing Jones's Constitutional rights for conduct over which Mr. Jones had no control, and about which, the record reflects, he knew nothing. If the Court genuinely believed counsel erred in the treatment of the deposition material in counsel's motion for a commission to depose Ms. Clinton, the remedy was against counsel, not the client. The de minimis recitation of facts in the motion for a commission did not violate a court order and any suggestion that it was is demonstrably false. Even if there was a violation, the decision to rely on that conduct as part of a motion to default the defendants and deny Jones his Constitutional rights is inexplicable.

### *Reason Number Two: Alex Jones Lawyers Could Not Provide Trivial Analytics Profits Data*

Second, there was a claimed failure to submit analytics in the custody and control of third parties, e.g. Google, Twitter and Facebooks that may show how many vitamin supplements were sold in relation to the airing of any Sandy Hook- related story. The Court concluded the defendants had failed to provide "full and fair compliance" with a request for the data, thus willfully withholding information that was of "critical importance" to the plaintiffs, although no one ever explained why it was of "critical importance" to the plaintiffs. The Court declined to consider monetary sanctions or preclusion of evidence as sanctions as inadequate finding only a default was appropriate. The Connecticut Plaintiffs urged, and the Court concluded, the Connecticut Plaintiffs

were prejudiced in some inexplicable way by the failure to produce limited financial and analytics data on the timing of product sales.  Despite the alleged "importance" of the issue, neither the Connecticut Plaintiffs nor the trial Court ever set forth just what it thought Google Analytics was or what it was to be used for. But it is self-evident.  The Connecticut Plaintiffs wanted to see if sales of product correlated to any Sandy Hook broadcast.  But the Supreme Court is clear that a "profit motive" has nothing to do with Constitutional protections. *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667, 109 S. Ct. 2678, 2686 (1989) ("If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels.").   At most, the plaintiffs might have been entitled to an adverse inference of some sort at trial, although just what the inference should be is difficult to fathom given the complete lack of evidence to support the theory so dear to the hearts of plaintiffs' counsel – a belief that the defendants target marketed what topics they discussed solely to increase social media exposure as part of a plan to sell nutraceutical products. The truth is that Sandy Hook was a minuscule portion of what Mr. Jones commented on in the years since 2012, however much the plaintiffs may wish it were otherwise.

### *Reason Number Three:  The Court Refused To Accept Alex Jones's Accountant's Explanation of Minor Financial "Subaccount" Data Accepting The Explanations of a Non-CPA Instead*

The final of the three "death penalty" grounds were the alleged infirmities in attempts to correct and/or supplement disclosures in a financial affidavit called a "subsidiary ledger" by an expert retained by the defendants, Robert Roe.  The Court found Mr. Roe's affidavit "not credible in light of the circumstances," asserting that Mr. Roe had submitted a "sanitized, inaccurate" set of records.  Here is the background. The Connecticut Plaintiffs sought financial information again intended to determine how much money the defendants made in connection with Sandy Hook related publications.   Connecticut Plaintiffs took the deposition of Melinda Flores, a bookkeeper

at FSS. She was ordered to produce certain financial records, including "trial balances." The documents she produced did not satisfy the plaintiffs. The defendants retained an expert, a CPA named Robert Roe, to attempt to locate and to provide to the plaintiffs' data in a form acceptable to them. His efforts failed to satisfy the plaintiffs, who filed yet another in a series of motions for sanctions. A sworn statement by Mr. Roe stated that FSS did not maintain records in the form requested by the plaintiffs, going so far as to state that the term "subsidiary ledgers" they used in their request was not a term with an accepted meaning among accounts. The Connecticut Plaintiffs tendered a counter affidavit from their own expert, a forensic fraud examiner but not a CPA, who opined the "subsidiary ledgers" was, in fact, a well understood and generally accepted term. The Court sided with the plaintiff's papers and rejected Mr. Roe's opinion on the papers. "The court rejected the statement of accountant retained by FSS that FSS does not 'maintain or utilize' subsidiary ledgers as not credible in light of the circumstances." The absence of a meaningful evidentiary record to support this finding as to Mr. Roe, is itself beyond questionable, but the Supreme Court has been crystal clear that financial or profit motives have nothing to do with Constitutional rights and it was incomprehensible that Mr. Jones Constitutional rights would be forfeited because the Connecticut Plaintiffs may have been hindered in some way showing how much money Mr. Jones made

### E.   CONNECTICUT COMPLAINT

Turning to the Complaint, the Connecticut jury was instructed that the court had determined Alex Jones had committed with malice each and every act the Connecticut Plaintiffs stated. Here, however, that Complaint must be reviewed in detail as the United States Supreme Court places an unwaivable duty on a federal court to "review findings of fact by a state court where a federal right has been denied on the basis of a fact without evidence to support it and where a conclusion of law

as to a federal right and a finding of fact are so intermingled to require analysis of the facts." *Bose Corp. v. Consumers Union*, 466 U.S. 485, 506 n.24, 104 S. Ct. 1949, 1962 (1984).  The rule that the court ___*must*___ "examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment" was established in *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 285, 84 S. Ct. 710, 728-29 (1964).

Thus, it is Constitutionally impermissible for this Court to simply accept the inexplicable death penalty sanction that extinguished all of Mr. Jones Constitutional rights simply because the Connecticut Plaintiffs convinced a Connecticut trial court to extinguish those rights for the three trivial reasons just referenced.  And even if a Court incorrectly refuses to look behind to the allegations in the Connecticut Complaint itself, it absolutely then at least looks at the death penalty order.  In short, it must examine ___*something*___ to fulfill its duty.  Looking at just a few things in the Connecticut Complaint make the unconstitutional travesty clear.

First, the Complaint identifies no "express statements" that were allegedly made by Mr. Jones that are libelous.   In a traditional libel complaint, precise statements are quoted so that the court and parties can review and assess the words and context.  The Connecticut Complaint, although prolix, nowhere clearly highlights the precise allegedly libelous statements Mr. Jones was accused of making.

Second, the Complaint inserts its own summaries of meanings, interspersed with article headlines, surrounding factual anomalies, leaving a reviewing court to have to guess to determine precisely what was the libelous "statement" and more importantly, why it was libelous. As one example of numerous, in several places, the Complaint purports to quote someone saying that CNN reporter Anderson Cooper was operating behind a greenscreen as his nose would disappear when

he would move.  See e.g., Connecticut Complaint, ¶¶222; 230; 240; 259; 264.  Was this libelous?  Was it true?  The jury was told it was maliciously libelous without explanation.  Or another example is the repeated reference to one of the Connecticut Plaintiffs asking about cue cards while being interviewed on TV. See e.g., Connecticut Complaint, ¶¶ 102; 103; 105; 112; 113 ("ok, do I read off the card?"). Was this libelous?  Was it true?  It did not matter.  The jury was told it was maliciously libelous without explanation.

Second, it is clear that the Connecticut Plaintiffs sought to hold Mr. Jones responsible for what independent third parties said and did.  In one example of many, the Connecticut Plaintiffs identified Defendant Wolfgang Halbig as an independent journalist and investigator who resides in Sorrento, Florida and who was the creator and operator of "the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com."  It also identified Defendant Cory T. Sklanka as a journalist who works with Halbig.  Connecticut Complaint, ¶¶ 36 & 37.  Although Halbig's name is used over 77 times in the Connecticut Compliant, other than a few references to Halbig's appearance as an occasional guest on Mr. Jones' show [Connecticut Complaint, ¶ 68] there are no allegations that would even remotely make Mr. Jones responsible for Halbig's statements and actions other than the completely unverified and conclusory allegation that "Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut."  Connecticut Complaint, ¶ 74.  The lone exception is the unverified, unsupported, conclusory and inaccurate statement that Halbig was "at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of the Jones defendants."  Connecticut Complaint, ¶87.  This lone, conclusory allegation is nothing but sheer conjecture and certainly nothing that overcomes Mr. Jones's first amendment rights. Yet the jury was told Mr. Jones was maliciously responsible for everything Halbig did.

Third, the Connecticut Complaint is replete with acts of third parties in allegedly stalking some of the Connecticut Plaintiffs.   Connecticut Complaint, ¶¶ 14; 15 ("They have confronted strange individuals videotaping them and their children."); 16; 55 ("In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.).  With no allegation and certainly no evidence, all of these acts were simply laid at the feet of Alex Jones and the jury was told Mr. Jones was maliciously responsible for these acts.

And Mr. Jones was powerless to refute them given the death penalty sanctions rendered against him.  This of course, leads to the question of what Alex Jones did that was so serious a threat to the Connecticut judicial system that his Constitutional rights were forfeited.  Read Exhibit A.

**F.    CONNECTICUT TRIAL AND UNCONSTITUTIONAL VERDICT AND JUDGMENT**

As stated, the six-person jury and Court that was untethered by the Constitution went wild in its award giving the following amounts to the following persons:

| | | | |
|---|---|---|---|
| Total Award for Erica Lafferty: | $116,000,000.00 | Total Award for William Sherlach: | $76,000,000.00 |
| Total Award for David Wheeler: | $73,330,000.00 | Total Award for Francine Wheeler: | $72,000,000.00 |
| Total Award for Mark Barden: | $76,800,000.00 | Total Award for Jacqueline Barden: | $38,400,000.00 |
| Total Award for Ian Hockley: | $108,800,000.00 | Total Award for Nicole Hockley: | $98,130,000.00 |
| Total Award for Carlos Mathew Soto: | $76,800,000.00 | Total Award for Donna Soto: | $64,000,000.00 |
| Total Award for Carlee Soto Parisi: | $88,000,000.00 | Total Award for Jillian Soto-Marinio: | $91,730,000.00 |
| Total Award for William Aldenberg: | $120,000,000.00 | | |

**IV.**
**CAUSES OF ACTION**

Alex Jones incorporates by reference each and every fact herein above set forth.

By the acts hereinabove complained of, and others which will be demonstrated at trial, the Connecticut Plaintiffs have violated Alex Jones's rights under the First and Fourteenth Amendments of the Constitution of the United States.   These acts include, without limitation,

a.      the denial of Mr. Jones substantive and procedural due process rights;

b.      the striking of all Mr. Jones defenses, and forbidding him to speak while imposing strict liability on him for all acts of which the Connecticut Plaintiffs complain thereby depriving him of the ability to fully and fairly litigate the claims asserted against him;

c.      holding Mr. Jones responsible for acts and statements of others over which he neither had nor exercised control;

d.      holding Mr. Jones responsible for acts of stalking and harassment by unknown persons with whom he was not affiliated and over which he neither had nor exercised control;

e.      working alone or jointly with others, procuring the expulsion of Mr. Jones from airwaves seeking to deprive him of a platform for the exercise of his First Amendment rights of speech;

f.      working directly and indirectly with the Connecticut judiciary to achieve excessive, inordinate and punitive emotional distress and punitive damages, in violation of the Eight and Fourteenth Amendments;

g.      working directly and indirectly with the Connecticut judiciary to achieve unconstitutional takings of his property in violation of the Constitution, including

the taking of his rights to use the airwaves for exercise of his First Amendment rights;

h.      working directly and indirectly with the Connecticut judiciary to achieve these violations of Mr. Jones's Constitutional rights.

All of the acts herein above addressed occurred under color of state law as the Connecticut Plaintiffs instigated the acts of the Connecticut state court about which complaint is made.

As a direct and proximate result of these acts and wrongful conduct, Mr. Jones has experienced loss of property, anguish, embarrassment, humiliation, stress and will continue to suffer such damages, all of which have been proximately caused by the Connecticut Plaintiffs.

## PRAYER FOR RELIEF

Based on the forgoing, Mr. Jones asks this Court to

a.   preliminarily and permanently enjoin the enforcement of the Connecticut Judgment;

b.   issue appropriate declarations that the acts herein complained of and others that shall be proved at trial are unconstitutional and hence void;

c.   award Mr. Jones all legal damages to which he shall show himself justly entitled;

d.   award Mr. Jones pre and post judgment interest;

e.   award Mr. Jones his attorney's fees and costs;

f.   award Mr. Jones such other relief, legal and equitable, to which he shall be justly entitled.

Dated: October 28, 2024

_/s/ Shelby A. Jordan_____
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
***Jordan & Ortiz, P.C.***

500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
      aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**COUNSEL FOR ALEX JONES**

Ben C. Broocks
State Bar No. 03058800
Federal Bar No. 94507
William A. Broocks
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM P.L.L.C.
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
**CO-COUNSEL FOR ALEX JONES**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 28, 2024, a true and correct copy of the foregoing document was served via e-file/e-mail in accordance with the Texas Rules of Civil Procedure:

Ryan E. Chapple
rchapple@cstrial.com
Benjamin D. Evans
bevans@cstrial.com
Bethany G. Gingras
bgingras@cstrial.com
CAIN & SKARNULIS PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701

Crissie Stephenson
Vickie Driver
Elliott, Thomason & Gibson, LLP
511 N. Akard, Ste. 202
Dallas, Texas 75201
crissie@etglaw.com
vickie@etglaw.com

Joshua W. Wolfshohl
Michael B. Dearman
Jordan T. Stevens
Kenesha L. Starling
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
jwolfshohl@porterhedges.com
mdearman@porterhedges.com
jstevens@porterhedges.com
kstarling@porterhedges.com

Erin E. Jones
**JONES MURRAY LLP**
602 Sawyer Street, Suite 400
Houston, Texas 77007
erin@jonesmurray.com

Kell C. Mercer
Kell.mercer@mercer-law-pc.com

*/s/ Shelby A. Jordan*
Shelby A. Jordan